Luis P. **GARRIGO** and Estela Garrigo, his wife

v.

**UNITED STATES of America.**

Civ. A. No. 3–2484.

United States District Court
N. D. Texas,
Dallas Division.

Nov. 12, 1968.

William F. Callejo, Dallas, Tex., Joe Unger (of Smith & Mandler), Miami Beach, Fla., for plaintiffs.

Robert L. Trimble, Atty., Tax Division, Dept. of Justice, Fort Worth, Tex., for defendant.

## MEMORANDUM OPINION

ESTES, Chief Judge.

This is an action brought by plaintiffs, Dr. and Mrs. Luis P. Garrigo, for refund of income taxes paid for the years 1961, 1962 and 1963. For each of those years, plaintiffs timely filed income tax returns and paid income taxes of $608.07 in 1961; $1,132.00 in 1962; and $1,196.63 in 1963. By filing amended returns for each of those years, on October 5, 1964, plaintiffs claimed refunds for the amounts paid. On March 2, 1966, their claims were disallowed, and this suit followed.

The questions presented herein involve the income tax treatment of losses sustained by the plaintiffs as a result of certain confiscatory acts of the Cuban Government. To be deductible, the losses claimed must have occurred after the plaintiffs became resident aliens of the United States and must have occurred in the plaintiffs' trade or business or in transactions entered into for profit.[1] If deductible as losses from the sale or disposition of property, the amount of the deduction is limited to the adjusted basis of the property lost[2]; and the nature of the deduction is governed by Section 1231, which pertains to property used in a trade or business and to property involuntarily converted.

The Government contends that any losses sustained by plaintiffs occurred before or at the time they left Cuba and, thus, before they became resident aliens of the United States. Alternatively, if any deductions are allowed for losses incurred after they became resident aliens, the Government has raised specific defenses concerning the nature and amount of any allowable deduction.

Plaintiffs, on the other hand, contend that their losses did not occur prior to October 20, 1960, the date they departed Cuba and became resident aliens of the United States. Their contention is that their losses were incurred on December 5, 1961, when the Cuban Government enacted Law 989, which, in essence, provided for the confiscation without compensation of all property owned by Cuban nationals who had left Cuba. They claim an operating loss of $102,606.85 and capital losses totaling $119,683.00, more specifically broken down as follows:

(1) 80 shares of stock in Productora Superfosfatos, S.A., purchased in 1958 for approximately $4,800.00;

(2) 340 shares of Fabrica Nacional de Pinturas, S.A., purchased in 1957 at an approximate cost of $3,000.00;

(3) 1,398 shares of Central Santa Lutgarda, S.A., inherited by Mrs. Garrigo from her father in 1951 and valued at that time at $81,783.00;

(4) 40 shares of stock in Cuban Telephone Company, bought in 1958 at an approximate cost of $4,000.00;

(5) 21 bonds of the Cuban Electric Company: 20 belonging to Dr. Garrigo (although listed in his mother's name) and purchased from 1950 through 1959, and one purchased by Mrs. Garrigo around 1958, all 21 bonds having an approximate total cost of $21,000.00;

(6) 1 share of the Trust Company of Cuba, given to Mrs. Garrigo around 1956 (purchase date unknown) and estimated to have an approximate value of $100.00;

(7) 5 bonds of the Cuban F.H.A., purchased between 1955 and 1960 at an approximate cost of $5,000.00;

(8) One two-story brick, mortar and concrete building used for rental purposes (renting for approximately $325–350 per month) located on a lot at 9th and F Streets, Havana, Cuba, inherited by

---

1. Section 165(c). All references herein are to the Internal Revenue Code of 1954.

2. Section 1011.

Mrs. Garrigo at her father's death in 1951, at which time the land was valued at $23,256.00 and the building at $35,580.00, for a total value of $58,836.00;

(9) One three-story brick and cement building used for rental purposes (renting for approximately $275 per month) located at 322 San Lazaro, Havana, Cuba, inherited by Mrs. Garrigo at her father's death in 1951, at which time the land and building were valued at $24,383.00;

(10) An undivided one-fourth interest in 58.33 acres of land in Marianao County, Cuba (situated on the outskirts of Havana), which interest was acquired by Mrs. Garrigo at her father's death in 1951, when it was valued at $1,500.00;

(11) One stone beach house and lot located at Veradero Beach, Matanzas, Cuba, in which Mrs. Garrigo owned an undivided one-fifth interest inherited from her father in 1951 and valued at that time at $9,156.00. Because the house was used by Mrs. Garrigo and other members of her family during the summer months and rented from time to time during the tourist season, plaintiffs claim a loss equal to only one-half of Mrs. Garrigo's one-fifth interest, or $4,578.00;

(12) Money on deposit in the Royal Bank of Canada in the approximate amount of $800.00, said account used by Dr. Garrigo for his medical practice; and money on deposit in the Trust and Bank Company in the approximate amount of $1,200.00, said account used by Mrs. Garrigo for deposit of rentals and other monies from business ventures; and

(13) Assorted office and library furnishings, technical equipment, medical books, and one 1960 Vauxhall automobile, all used by Dr. Garrigo in his medical practice and having an approximate value of $11,309.30.

The Court finds that plaintiffs did not abandon the property they owned when they fled Cuba; they intended to return at such time when the Castro regime lost power. However, because of certain confiscatory acts of the Cuban Government, the nature of certain properties owned by the Garrigos, and the lack of sufficient evidence as to adjusted basis of several items, most of the losses they sustained are ineligible for the special treatment by way of deductions allowed under Section 165. The Court has carefully considered each specific claim and finds as follows:

## I. CORPORATE STOCKS AND BONDS

By Resolution No. 1 (August 6, 1960) of Law No. 851 (July 6, 1960), the Cuban Government confiscated all the assets of some twenty-six corporations, among these the Cuban Telephone Company and the Cuban Electric Company. Law No. 851 provided for the issuance of Cuban Government bonds as compensation for the assets taken, but it did not provide an effective amortization plan or sinking fund for retirement of the bonds; no bonds in fact were ever issued by the Cuban Government.

By Law No. 890 (October 13, 1960), the Cuban Government confiscated all the assets of several hundred additional corporations, among them the Fabrica Nacional de Pinturas, S.A., and Central Santa Lutgarda, S.A. Law No. 890 stated that payment of indemnity to the corporations affected would be provided by a future law. However, no such indemnification law was ever enacted.

On August 7, 1960, the Cuban Government intervened the property of Productora Superfosfatos, S.A., such action taken without an officially published decree. This action was later ratified by decree in early October of 1960, but no indemnification was made by the Cuban Government to the corporation for this confiscation.

■ As a result of the confiscation of the underlying assets of these five

corporations without any indemnification, the stocks and bonds issued by them, including those held by the plaintiffs herein, became worthless at the time of the confiscation. United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927). Thus, the loss on these securities being sustained while the plaintiffs were still residents of Cuba, such loss is not deductible under Section 165.

■ As to the losses sutained on the share of stock in Trust Company of Cuba and the five Cuban F.H.A. bonds, plaintiffs contend these were losses under Section 165(g) pertaining to worthless securities. They rely upon example (2) in Rev.Rul. 62–197 [3], which held that a taxpayer who owned securities in a corporation operated exclusively in Cuba was entitled to a loss deduction under Section 165(g) where all the corporate assets were seized by the Cuban Government. That example is distinguishable from the case under consideration, however. It involved a situation where the *assets* of the corporation were seized, rather than the instant one where the *stock* itself was confiscated. The assets of these corporations were not seized by order of the Castro Government under laws previously discussed, so this Court will assume the certificates were lost as a result of the confiscation under Law 989. The difference in the thing confiscated brings about the difference in the result [4], the result being that the Garrigos' loss is characterized as ordinary under Section 1231, rather than capital under Section 165(g). Such loss entitles plaintiffs to a deduction in the year of the confiscation, herein determined to be 1961, but does not entitle them to the net operating loss carryover benefits of Section 172 or the capital loss carryover benefits of Section 1212.

3. 1962–2 Cum.Bull. 66, 67.

4. See Wolfe and White, Income Tax Consequences of Cuban Expropriations to

## II. LAND AND RENTAL PROPERTY

■ The plaintiffs claim losses for rental properties located in Havana, Cuba. On October 14, 1960, the Cuban Government enacted the Urban Reform Law, thereby intervening all urban rental property in Cuba and giving the ownership thereof to the tenants then occupying it. This law promised future indemnification to owners under a formula based on the construction date of the property intervened and the amount of rental income being received. Under this formula, the plaintiffs would have been entitled to five years' monthly rentals for their properties located at 9th and F Streets and on San Lazaro Street. To be entitled to indemnification, however, a claimant had to file his claim with the Cuban Government and, both at the time of filing and at the time of receiving each monthly indemnification payment, the claimant had to be a resident of Cuba. Plaintiffs herein never filed such a claim and have received no income from these properties for the months subsequent to the decree of October 14, 1960. Therefore, the loss of these rental properties effectively occurred on October 14, 1960, while plaintiffs were still residents of Cuba, and such loss is not deductible under Section 165.

■ As to the beach house and lot located at Veradero Beach, Cuba, plaintiffs have failed to establish that the loss of this property was one incurred in their trade or business or in a transaction entered into for profit. This property was used by all the members of Mrs. Garrigo's family primarily as a vacation home; and while it was rented occasionally during the tourist season, this fact alone is insufficient to give rise to a deduction under Section 165. Furthermore, plaintiffs have failed to

Cuban Resident Aliens, 19 Miami L.Rev. 591, 598–599 (1965).

establish by competent proof the adjusted basis of this property, which is essential in determining the amount of an allowable loss. The adjusted basis for deduction purposes is the original basis less depreciation.[5] The original basis of inherited property is its fair market value at the date of inheritance.[6] Mrs. Garrigo inherited a one-fifth interest in the beach property in 1951, and the fair market value assigned her interest at that time was, at best, an educated guess. Even if the value were accurate, the amount was not allocated between the house and lot, making determination of depreciation impossible. For these reasons, the losses of the beach house and lot are not deductible under Section 165.

■ Plaintiffs claim a deductible loss for Mrs. Garrigo's one-fourth interest in approximately fifty-eight acres of land in Marianao County, Cuba. They allege that the land was being farmed to produce mangoes for sale, and that it, therefore, constituted property used in a trade or business. The evidence is clear, however, that the land was really being held for investment purposes due to its advantageous location on the outskirts of Havana. Thus, Mrs. Garrigo's inherited interest was a capital asset, and the deductible loss thereon is governed by Section 1231. As an ordinary loss under Section 1231, the allowable deduction to which plaintiffs are entitled is limited to the year of expropriation (1961) and is not subject to the net operating loss carryover benefits of Section 172 or to the capital loss carryover benefits of Section 1212.

### III. BANK DEPOSITS

■ Plaintiffs claim a deduction for loss of an estimated two thousand Cuban pesos left on deposit in two Cuban banks. They claim these accounts were business property, in that the funds consisted of fees from Dr. Garrigo's medical practice and monies received by his wife from her rental properties. However, once money is received and subjected to the unrestricted disposal of the recipient, such money becomes personal property irrespective of the source from which it was received. The money in the two accounts was personal property of the plaintiffs, and a loss thereon is not deductible.

■ Furthermore, the money on deposit was in the form of Cuban pesos. While at one time the Cuban peso was equivalent to one United States dollar, after Castro's hostility toward the United States became known in 1960, the value of the Cuban peso in terms of the United States dollar dropped substantially and the exchange rate in the black market fluctuated. Thus, even if the deposits in question were deductible, the amount of the loss would have to be converted to United States dollars at the rate in effect at the time the loss occurred. Plaintiffs presented no evidence concerning that rate at the time of their claimed loss and, therefore, have failed to establish the amount thereof, which is essential to deductibility.

### IV. MEDICAL EQUIPMENT, FURNISHINGS AND AUTOMOBILE

■ The remaining property for which a loss is claimed is property used in Dr. Garrigo's medical practice. In 1953 Dr. Garrigo entered into partnership with Dr. Luis I. Arias for the practice of medicine in Havana, Cuba. Throughout their partnership, they leased the offices in which they conducted their medical practice. They jointly purchased and owned the office furniture but separately purchased and owned their technical equipment. In 1958 Dr. Garrigo converted one room of his home into a medical library and furnished it with a desk, chairs, bookshelves, file cabinet, draperies and decorations. The library contained an estimated five

---

5. Section 1011.

6. Section 1014(a).

hundred medical books.[7] The deductible loss on this property is limited to Dr. Garrigo's adjusted basis in such property, which is its cost less depreciation, as shown on the Schedule of Depreciation, appended. The total allowable deduction to which plaintiffs are entitled under Section 165 for loss of the property described in the Schedule of Depreciation is $3,888.59.

Dr. Garrigo also owned a 1960 Vauxhall automobile which he used in his medical practice. The automobile was purchased in early 1960 for approximately $2,500.00. The guidelines for depreciation contained in Rev.Proc. 62–61, 1962–2 Cum.Bull. 418, establish a useful life for automobiles of three years. Using a three-year useful life and a 20% salvage value, the automobile had an adjusted basis of $1,166.68, as of December, 1961, which is the measure of the deductible loss to which plaintiffs are entitled under Section 165.

Judgment shall be entered accordingly. Counsel are directed to prepare and present forthwith a judgment consistent with this Memorandum Opinion.

## SCHEDULE OF DEPRECIATION

| Item | Year of Purchase | Cost [1] | Prior Depreciation Allowed or Allowable [2] | Adjusted Basis on 12/5/61 |
|---|---|---|---|---|
| Waiting Room Furniture | 1953 | $ 400.00 | $ 324.00 | $ 76.00 |
| Receptionist Office Furniture | 1953 | 100.00 | 81.00 | 19.00 |
| Doctors' Office Furniture | 1956 | 750.00 | 405.00 | 345.00 |
| Examining Room Furniture | 1956 | 500.00 | 270.00 | 230.00 |
| Airconditioner | 1956 | 200.00 | 108.00 | 92.00 |
| Oscillograph | 1954 | 200.00 | 144.00 | 56.00 |
| Traction Aid | 1958 | 670.00 | 241.20 | 428.80 |
| Ultrasonic Generator | 1959 | 645.00 | 174.15 | 470.85 |
| Tycos Mercurial Manometer | 1953 | 40.00 | 32.40 | 7.60 |
| Ophthalmoscope | 1953 | 74.00 | 59.94 | 14.06 |
| Oscillometer | 1953 | 72.00 | 58.32 | 13.68 |
| X-Ray Transluminator | 1953 | 100.00 | 81.00 | 19.00 |
| Scissors, Pliers, etc. | 1960 | 300.00 | 27.00 | 273.00 |
| Whirlpool Bath & Chair | 1958 | 900.00 | 324.00 | 576.00 |
| Library Furniture | 1958 | 1,590.00 | 572.40 | 1,017.60 |
| Medical Books | 1941–1960 | 2,500.00 | 2,250.00 | 250.00 |
| TOTAL | | $9,041.00 | $5,152.41 | $3,888.59 |

1. The cost figures for the jointly-owned furniture represent only Dr. Garrigo's one-half interest therein.

2. The amount of depreciation was determined by using a salvage value of 10% and a 10-year useful life. See Guidelines for Depreciation, Rev.Proc. 62–61, 1962–2 Cum. Bull. 418.

7. Plaintiffs also claim a loss for a radio and certain non-professional books contained in the library, but these items are personal property and are not deductible.