Luis and Alicia P. Bosch v. Commissioner.
Bosch v. Commissioner
Docket No. 5801-66.
United States Tax Court
T.C. Memo 1970-66; 1970 Tax Ct. Memo LEXIS 293; 29 T.C.M. (CCH) 284; T.C.M. (RIA) 70066; March 17, 1970, Filed *293 1. By the Cuban Urban Realty Reform Law which became effective October 15, 1960, petitioner, Luis Bosch, a resident Cuban national, was divested of two rental properties located in Havana. The Law provided a general scheme for the payment of indemnity for properties so divested subject to certain prerequisites and contingencies. Had Bosch met all the requirements for indemnification, he would have become entitled under the Law to receive indemnity payments of $570 peso dollars per month for 15 years. But without taking any of the steps which would have entitled him to receive the said payments, he departed Cuba October 24, 1960, with no intention of returning "until there was a change in the political climate existing in Cuba at that time." Up to the time of the trial, Bosch had never returned to Cuba. By Law 989 which became effective December 6, 1961, it was decreed that, with respect to Cuban nationals who had left Cuba and had not effected reentry within the period for which the exit permit had been authorized, it should be considered that the country had been permanently abandoned and "all their personal, real, or other property, rights, stocks and securities of any kind" *294 should "be understood to be nationalized by confiscation, in favor of the Cuban State" and should "be assigned to the appropriate agencies." The period for which petitioners' exit permits had been authorized extended from October 21, 1960, the date of the said permits, to October 21, 1961. Held: That Bosch at no time after he became a resident alien in the United States had a subsisting right, with respect to which there was a reasonable prospect of recovery, under the Urban Realty Reform Law to indemnity for the two rental properties so as to be nationalized by confiscation by Law 989 when it became effective on December 6, 1961, and he was not entitled to a claimed loss deduction therefor for the taxable year ended January 31, 1962, or to net loss carryovers to the years ended January 31, 1964 and 1965, the years herein. 2. Bosch was the owner of a 20 percent interest in a partnership which was engaged in the textile manufacturing business in Havana. By Law 890 which became effective October 15, 1960, the textile manufacturing business belonging to the said partnership was nationalized "by forceful expropriation," adjudicating all properties, rights and investments thereof in *295 favor of the Cuban Government and "subrogating the State in the place and grade of the natural or legal persons owning said" enterprise. Law 890 did not, as was true of the Urban Realty Reform Law, provide a general scheme for indemnifying property owners of the property interests expropriated under that Law. It did carry a provision to the effect that "the measures and forms for payment of indemnity to the natural or legal persons affected by the expropriation provisions of the law will be regulated by a future law" and "to that effect, the Central Planning Council will proceed to place before the Council of Ministers within as short a time as possible the corresponding project providing for such law." No indemnification statute has been enacted by the Cuban Government to provide indemnity payments to owners of business enterprises confiscated by Law 890. 285 Held: That Bosch at no time after he became a resident alien in the United States had a subsisting right to indemnification for his 20 percent interest in the textile manufacturing partnership and was not entitled to a claimed loss deduction therefor for the taxable year ended January 31, &962, or to net loss carryovers *296 to the years ended January 31, 1964 and 1965, the years herein. Stanley Schoenbaum 1501 Alamo National Bldg., San Antonio, Tex., and Michael Waris, Jr., Robert McKenzie, Washington, D.C. for the petitioner. Ralph V. Bradbury, Jr., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: Respondent determined deficiencies in income tax against the petitioners as follows: Year Ended
Deficiency
January 31, 1964
$ 726.98
January 31, 1965
7,646.85
The petitioners have claimed a refund for the taxable *297 yea The petitioners have claimed a refund for the taxable year ended January 31, 1964, in the amount of $2,236.13. The question for determination, both with respect to the deficiencies determined by the respondent and the refund claimed by the petitioners, is whether losses resulting from expropriation or confiscation by the Cuban Government of property located in Cuba and belonging to Luis Bosch were sustained in 1961 after Bosch had become a resident alien in the United States. Findings of Fact Some facts and the evidence of other facts have been stipulated and the facts stipulated are found as stipulated. Petitioners, Luis and Alicia P. Bosch, are husband and wife. They filed joint income tax returns for the years involved herein with the district director of internal revenue, Austin, Texas. On the date of filing their petition, they were residents of Laredo, Texas. Luis Bosch will sometimes hereafter be referred to as petitioner or Bosch. The petitioners are Cuban nationals, and on and prior to October 24, 1960, lived in Cuba. On that date they departed from Cuba and entered the United States where they have since lived as resident aliens. Neither of them has ever returned *298 to Cuba. On and prior to October 14, 1960, petitioner Luis Bosch owned two rental properties and a 20 percent interest in a textile manufacturing business known as Bosch-Carrio y Cia. One of the rental properties was a fourstory office building of brick and reinforced concrete construction, located in Havana. It was built in 1955 at a cost of $110,000 peso dollars. The cost of the land was $25,000 peso dollars. Petitioner's adjusted basis for the land and building on October 14, 1960, was $110,800 United States dollars. The other rental property was a singlestory brick and reinforced concrete apartment building also located in Havana. It had been constructed in 1947 at a cost of $65,000 peso dollars. The cost of the land was $10,000 peso dollars. Petitioner's adjusted basis for the land and building on October 14, 1960, was $38,600 United States dollars. On October 14, 1960, the Council of Ministers voted and the President of Cuba approved the Urban Realty Reform Law. It became effective upon its publication in the Official Gazette of the Republic of Cuba on October 15, 1960. [1]
*299 In substantial part, the Urban Realty Reform Law provided as follows: URBAN REALTY REFORM LAW ARTICLE 1. Every family is entitled to a decent dwelling. The State shall enforce this right in three successive stages: (a) Present stage. The State shall make it possible for each family to amortize the house in which they live with what they are presently paying for rent, within a period of not less than five years nor more than twenty years, according to the year in which the property was built. * * * CHAPTER I Nullity of Contracts of Assignment of Use of Urban Real Estate * * * ARTICLE 5. All lease contracts covering urban realty existing at the time of the publication of this law in the Official Gazette of the Republic are hereby rendered null and void for all purposes. All sub-lease contracts covering urban realty existing at the time of the publication of this law in the Official Gazette of the 286 Republic are hereby likewise rendered null and void for all purposes. * * * CHAPTER II Conveyance of Title to Urban Real Estate ARTICLE 7. Seven "Provincial Urban Reform Boards" are hereby created tentatively, and, with permanent character, a Superior Urban Reform *300 Council to handle all questions of a civil or social nature arising from the application of this law and which are connected with the purchase and sale contracts the execution hereof is hereby ordered. * * * The Provincial Urban Reform Boards shall settle all the questions referred to in the first paragraph of this Article within one calendar year counted from the date of their constitution, after the expiration of which they shall be disbanded. * * * ARTICLE 8. Every owner of urban realty shall be required to declare under oath, before the competent Provincial Urban Reform Board, the real estate owned by him or her and the rental earned by it. The tenant of every urban real property shall declare under oath before the competent Provincial Urban Reform Council, the particulars of such tenancy. ARTICLE9. The order in which the occupants will file their declarations will, whenever possible, be followed by the Provincial Urban Reform Boards to execute the respective purchase-sale contracts, providing for payment of the deferred price on the following terms and conditions: (a) If the lessee does not occupy the property, but has sub-leased it, or has assigned the use thereof to *301 some other person and it is so shown by the certificate issued by the Chief of the Revolutionary Armed Forces Unit stationed at the respective district, the purchase-sale contract shall be issued to the tenant of the premises regardless of whether he is a sub-lessee or not. (b) Notwithstanding the provision of the preceding paragraph, the tenant of any urban property, whether a lessee or otherwise, may buy such property by paying in a lump sum the still outstanding portion of the price thereof, or by paying partial amounts on account of such price, larger than those provided for in this law. (c) The individual appearing as buyer in the instrument executed hereunder shall be required to declare under oath the income out of which he expects to pay the installments of the price of the property involved, which income shall be pledged and encumbered to the extent of the still outstanding portion of the price. (d) In the event of non-payment by the buyer, the Provincial Urban Reform Boards may direct, if he works for an employer, that the amount necessary for the payment of his monthly obligation be paid out of his salary. The employers served with notices to that effect shall be *302 required to deduct and deliver to the Government the amounts which the buyer may undertake to pay every month on account of the price. * * * ARTICLE 13. The unpaid rentals under lease or sub-lease contracts outstanding as of the date of the execution of the purchase-sale contract shall be added to the total price of such purchasesale. * * * ARTICLE 15. The sale price shall be fixed on the basis of the date of construction of the property in question, as follows: * * * The urban properties built after the abovementioned date but before July 26, 1950 shall have, as legal price, the amount resulting from the addition of the monthly rental paid for the property on the date of the promulgation hereof, for five calendar years, plus one half of the years and months resulting from the arithmatical substraction from the date on which the property was built, of the date of July 26, 1940, less the Municipal Tax on Urban Realty and the Water Tax for the time so computed. The urban properties built after July 26, 1950 shall have, as legal price, the amount resulting from the addition of the monthly rental paid for the property on the promulgation hereof, for ten years, plus the years and *303 months resulting from the arithmatical substraction from the date of construction of the property, of the date of July 1950, less the Municipal Tax and the Water Tax for the time so computed. * * * ARTICLE 17. The price of the purchase-sale shall be paid in equal installments on the fifth day of each month. The amount of each of these installments, except the last, shall be the amount resulting from the following operations: The price presently paid by the tenant as rental shall be taken as a basis, and if no rental is paid, the amount shown as monthly rental on the last sworn declaration for Land Tax assessment classification filed prior to the date of the promulgation of this Law. From the sum thus 287 obtained the amount of one month of the Municipal Land Tax and one month of the Water Tax regularly paid by the property in question, if it is subject to such levies, shall be deducted. The amount of the last installment should coincide with the outstanding balance. If the monthly installments to be paid cannot be determined through the above described procedure, they shall be determined and fixed by the respective Urban Reform Board. * * * ARTICLE 21. The present owners *304 of the urban properties to be sold pursuant to this law shall receive from the Urban Reform Boards the price respectively fixed in installments equal to those which the buyers may be under the obligation to pay. ARTICLE 22. All amounts over and above a total sum of $600.00 per month receivable by the sellers of the properties hereunder by virtue of the provisions of this law as a result of the operations therein provided for, pertain to the State. * * * ARTICLE 28. The buyers of properties hereunder shall be required to pay the monthly installments of the purchase-sale price to the respective Provincial Urban Reform Board, and later, after the dissolution thereof, to the Superior Urban Reform Board. The Urban Reform Boards shall be required to deliver to the former owners the portions of the price received by them according as they receive said payments. The Superior Urban Reform Board may adopt whatever measures it may deem desirable to expedite the collection of the amounts payable on account of the outstanding part of the price of each property, and may even enter into agreements with the Municipal Administrations and the Waterworks operators for the simultaneous payment of *305 the monthly installments of the purchase-sale price, the Land Tax and the Water Tax. In cases of non-payment the Superior Urban Reform Board may resort to whatever measures it may deem appropriate to insure the due payment of the obligation resulting from the execution of the purchase sale contracts ordered by this Law. * * * ARTICLE 29. The properties transferred by virtue of the provisions of this Law may not be exchanged or traded, assigned, sold, or conveyed in anywise whatever by their new acquirers without the prior and express consent of the Urban Reform Boards and, if permitted, only on such terms and conditions as may be indicated thereby. In these cases the State shall have a preemptive right to buy the property. The urban properties used as dwellings are unattachable. It is hereby prohibited to constitute, after the effective date of this Law, any liens or encumbrances on urban properties. All contracts entered into in violation of the provisions of this Article shall be null and void, and non-compliance herewith may entail in each case, if the respective Urban Reform Board deems it proper, the forfeiture of the rights of the owner found guilty of such breach. *306 * * * CHAPTER VI Penal Provisions ARTICLE 44. Any action or omission designed to infringe, default, or void the rights and obligations established by this Law, shall be punishable by imprisonment for thirty-one to one hundred and eighty days, or fine of thirty-one to one hundred and eighty quotas, or both penalties. ARTICLE 45. Independently from the "penal sanctions" prescribed by this Law for the violators thereof, such violators shall be liable, in any case, as an administrative sanction applicable by the Urban Reform Boards created by this Law, to the forfeiture of the rights thereby recognized, and to the transfer to the State, when proper, of the title to the property in question. TRANSITORY PROVISIONS FIRST. The former lessees shall be required to deposit in the Postal Savings Fund, during the period to elapse between the date of publication of this Law and the date of execution of the purchase-sale contract covering the property occupied by each of them, the amounts equivalent to the rental heretofore paid by them under their leases, such amounts to be considered as payments on account of the purchase-sale price. These deposits must be made, in the case of the *307 monthly payments above referred to, even though prior payments be still pending. In the act of the execution of the purchase-sale contract the buyer shall deliver exchange for such payment. SECOND. The amounts received by the owners of the urban properties hereunder as surety deposits to answer for the due performance of their lease contracts shall, if so requested by the buyer, be applied by the Urban Reform Boards to the payment, to the extent thereby permitted, of the price receivable by the seller for the property heretofore owned by him. THIRD. The rights and benefits granted by this Law shall not apply to the foreign 288 citizens who do not have the legal status of residents. FOURTH. The benefits which this Law may grant to the President of the Republic, the Prime Minister and the Minister of the Government, shall be considered transferred to the Cuban State. FINAL PROVISIONS In use of the constituent power vested in the Council of Ministers this Law is hereby declared to form part of the Fundamental Law of the Republic to which it shall be appended. Consequently, this Law is hereby vested with constitutional force and rank, and shall become operative from its *308 publication in the Official Gazette of the Republic. NOW, THEREFORE: I hereby direct all persons fully to comply with and enforce this Law. DONE at the Presidential Palace, in Havana, this fourteenth day of October, 1960. OSVALDO DORTICOS TORRADO On becoming effective on October 15, 1960, the Urban Realty Reform Law divested Bosch of his two rental properties. He no longer had any proprietary rights in or ownership of the said properties. There was no right to recover the properties themselves, and his only right thereafter with respect to them was limited to such indemnity payments as he might become entitled to pursuant to the provisions and requirements of the said Law. The parties have stipulated that, "Had [Bosch] met all of the provisions required for indemnification he would have been entitled under the decree to $570 peso dollars per month for 15 years, * * * that the official and effective rate of exchange in 1960 was one United States dollar for one peso dollar," and that "the value of an unrestricted right to $570 United States dollars per month for 15 years under Regulations section 20.2031-7(b) is $80,267 United States dollars." In keeping with the declared *309 purpose of the Law, as quoted above, it was provided that the properties of which the owners were divested be sold to the tenants, the selling price to be determined pursuant to the formula set forth. Among other stipulations by the parties are the following: 10. Petitioner has never filed a claim for indemnification with the Cuban Government for the loss of his two rental properties. 11. Petitioner has received no income from either of his two rental properties since the intervention decree of October 14, 1960. 12. Petitioner has not exercised any control over the operation or use of said rental properties since October 14, 1960. * * * 16. The fair market value of each of the properties at all dates pertinent hereto was no less than its adjusted basis. By action of the Council of Ministers, approved by the President of Cuba and published in the Official Gazette of the Republic on October 15, 1960, it was provided by Law No. 890 as follows: Article 1 - The nationalization by forceful expropriation of all industrial and commercial enterprises, as well as the factories, warehouses, storage facilities, and other properties and rights inherent in said firms, is decreed, the *310 provisions applying to the following natural or legal persons: Group A Group N (page 4) Textiles and Confections 15. Bosch Carrio y Co. Article 2 - Therefore, all properties, rights, stocks and investments of enterprises listed in article I of this law are adjudicated in favor of the Cuban Government, thereby transferring all assets and liabilities and consequently subrogating the State in the place and grade of the natural or legal persons owning said enterprises. * * * Article 7 - The measures and forms for payment of indemnity to the natural or legal persons affected by the expropriation provisions of the law will be regulated by a future law. To that effect, the Central Planning Council will proceed to place before the Council of Ministers within as short a time as possible the corresponding project providing for such law. * * * Final Provision - All prior legal and regulatory provisions opposing the provisions of this law are declared null and void. The law shall be in effect upon publication in the official Gazette of the Republic. With respect to Article 7 of Law No. 890 above, the parties have stipulated that, "No 289 indemnification statute has been enacted *311 by the Cuban Government to provide indemnity payments to owners of business enterprises confiscated by this decree." They have further stipulated that the adjusted basis of Bosch "in the partnership Bosch-Carrio y Cia immediately prior to the intervention on October 15, 1960, amounted to $146,860 United States dollars," and that "Petitioner has received no income of any nature from the partnership, nor has he exercised any control over the operation or use of the assets of said business since publication of the intervention decree on October 15, 1960." Further stipulations of the parties made a part of the record herein are as follows: 22. The petitioners departed Cuba and entered the United States on October 24, 1960, where they have since lived as resident aliens. Neither of them has ever returned to Cuba. 23. Petitioners were authorized to leave Cuba under an exit permit dated October 21, 1960, * * *. 24. When the petitioners arrived in the United States on October 24, 1960, they had no intention of returning to Cuba until there was a change in the political climate existing in Cuba at that time. 25. Both prior to departing from Cuba and after arriving in the United *312 States, petitioner actively opposed the political and social regime of Fidel Castro. 26. The petitioners had the right under their exit permit to leave Cuba at any time on or before October 21, 1961, and could have returned to Cuba at any time during 1960 or 1961. 27. Petitioners' right to enter the United States was authorized by a visa dated July 10, 1958, valid for a four-year period, * * *. The petitioners obtained refugee status under the United States naturalization laws on November 24, 1961, at which time their visa was market "Cancelled by the United States Government." 28. On December 6, 1961, the Cuban Government published in the Official Gazette a decree providing for total confiscation of all property of whatever nature in Cuba owned by Cuban nationals who had left Cuba and did not return within the time granted them in their exit permits. This decree was enacted as "Law No. 989" and is otherwise known as the "Law governing exit from and entry into national territory." The decree provided, among other things, that there would be no indemnification for confiscations thereunder, and the decree extinguished any right to indemnification granted under prior decrees. * *313 * * Law 989 which became effective December 6, 1961, provided, in part, as follows: WHEREAS it is evidence that some persons belonging to classes affected by revolutionary measures and with unpardonable contempt for the Fatherland, abandon [sic] the country and WHEREAS the majority of these persons possess, in Cuba, miscellaneous property which must be made available to the people, in order to regulate exits from and reentry into national territory, as well as the disposition of the abandoned property NOW THEREFORE, by virtue of the power vested in it, the Council of Ministers decrees the following: LAW Article 1. The Ministry of the Interior has the authority to issue exit and reentry permits to persons who leave national territory. If reentry is not effected within the period for which the exit has been authorized it shall be considered that the country has been permanently abandoned. Article 2. In the cases of those persons embraced by the second paragraph of Article 1, all their personal, real, or other property, rights, stocks and securities of any kind shall be understood to be nationalized, by confiscation, in favor of the Cuban State and shall be assigned to *314 the appropriate agencies. Article 3. In reference to the property referred to in the preceding Article, the Urban Reform Council shall take possession of all real property used for housing as well as such personal property as is found within it. * * * TEMPORARY PROVISIONS Those persons who have left national territory prior to September 14, 1961, with the permission of the Urban Reform Council or any of its officials, may, prior to the expiration of the permit, request confirmation of the permit by the Ministry of the Interior for purposes of reentry into Cuba. The Minister of the Interior shall make a determination at his own discretion regarding the granting of authorization for reentry. FINAL PROVISION Any legal provisions and regulations which are in conflict with what this Law provides are hereby revoked, said Law to go into force upon its publication to the Official Gazette of the Republic. The parties have stipulated that, "Petitioners' first taxable income in the United States was earned in the period May 1, 290 1962, to January 1, 1963," but that petitioners paid no Federal income tax on that income "because of standard deductions and personal exemptions. *315 " On their income tax return for the year ending January 31, 1964, the petitioners reported taxable net income of $11,355.94, and income tax of $2,236.13, which was paid. Their business was shown as "retail drygoods." On their income tax return for the year ending January 31, 1965, the petitioners reported net taxable income of $31,491.06. On a schedule attached to the said return they claimed that Bosch had sustained a net operating loss of $464,853.60 on "December 5, 1961, by virtue of decree of Cuban Government expropriating properties owned by taxpayers." Of that amount, as a net operating loss carryover from their fiscal year ending January 31, 1962, they applied $31,491.06 against their reported net income of $31,491.06 to indicate no tax due. The respondent in his determination of the deficiencies herein disallowed the deduction of any amount as a net operating loss carryover to the taxable year ended January 31, 1965, stating that petitioners did not have a net operating loss in any taxable year which would be available as a net operating loss carryover to the taxable years ended January 31, 1964, or January 31, 1965. Prior to the determination of deficiencies herein, *316 the petitioners had filed a claim for refund of the $2,236.13 of income tax paid for the year ended January 31, 1964, on the ground that a proper application of net loss carryover from their taxable year ended January 31, 1962, would have resulted in no taxable income and no income tax due for that year, which claim for refund was denied by the respondent. Opinion As stated on brief, it is the position of the petitioners that the loss of Bosch "on the expropriation of his rental properties and partnership interest did not occur under the October 14, 1960 decrees because of the provisions for indemnification payments and promises to indemnify in such decrees" but that "his loss occurred when his rights to such payments were extinguished and the promises were withdrawn by the December 6, 1961 decree." [2] Arguing from that stated premise the petitioners contend that they sustained a net operating loss for the taxable year ended January 31, 1962, and were entitled to net loss carry-overs to the years ended January 31, 1964 and 1965 the years herein. *317 It is the position of the respondent that the losses were sustained in October 1960 before the petitioners, both Cuban nationals, became resident aliens of the United States and they are not therefore entitled to the loss deduction contended for or any carryover thereof to the taxable year. He argues that Bosch lost his rental properties by divestment on the effective date, October 15, 1960, of the Urban Realty Reform Law [3] and did not thereafter have a reasonable prospect of recovery therefore. The petitioners make no claim or contention that they are entitled to the loss deductions or any carryover thereof into the taxable years before us unless the losses were sustained after they became resident aliens of the United States. Neither of the parties makes any claim or contention that any rights in or ownership by Bosch of any property in Cuba survived the enactment of Law 989 which became effective on December 6, 1961. They have stipulated that petitioners' adjusted basis for the office building property, land and building, on October 14, 1960, was *318 $110,800 United States dollars and that for the apartment building property, land and building, on the same date was $38,600 United States dollars. They further stipulated that the fair market value of each of these properties "at all dates pertinent hereto" was no less than its adjusted basis. With respect to the textile manufacturing business, the parties have stipulated that the adjusted basis of Bosch "in the partnership Bosch-Carrio y Cia immediately prior to the intervention on October 15, 1960, amounted to $146,860 United States dollars." The stipulated bases of the two rental properties on October 14, 1960, and of the 291 interest of Bosch in the partnership on October 15, 1960, amount, in the aggregate, to $296,260 [4]United States dollars. It is that aggregate amount which petitioners now seek to deduct as the amount of the loss claimed to have been sustained by Bosch on December 6, 1961, the effective date of Law 989. *319 In New Colonial Ice Company, Inc. v. Helvering, 292 U.S. 435, at page 440, the Supreme Court said: Whether and to what extent deductions shall be allowed depends on legislative grace; and only as there is clear provision therefor can any particular deduction be allowed * * * a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms. That case has been cited and followed for the proposition stated in altogether too many cases to mention. of losses, it is provided by section 165(a)
As the general rule governing the deduction of the Internal Revenue Code that "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." The pertinent Regulation with respect to the year of deduction is to be found in section 1.165-1(d). [5] * * * *320 Under paragraph (2)(i) thereof, in the case of a loss resulting from a casualty or other event, no portion of the loss is to be regarded as sustained where "there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery" until it can be ascertained "with reasonable certainty whether or not such reimbursement will be received." Whether or not "a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances." Stated examples of occurrences by which it may be ascertained with reasonable certainty whether or not reimbursement will be received are "by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim," and where it is the claim of the taxpayer "that the taxable year in which a loss is sustained is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release." In paragraph (2)(ii) it is provided that, "If in the year of the casualty or other event a portion of the loss is not *321 covered by a claim for reimbursement with respect to which there is a reasonable prospect of recovery, then such portion of the loss is sustained during the taxable year in which the casualty or other event occurs." The year in which the losses herein were sustained and thus deductible being a question of fact, the burden of proof to show that they were sustained in 1961 when Bosch was a resident alien of the United States, as petitioners contend, and not in 1960 before they became such resident aliens, as determined by the respondent in his determination of deficiency, is the burden of petitioners. The purpose of the Urban Realty Reform Law as declared by Article 1 was to provide "every family" with "a decent dwelling" and that the State should enforce that right "in three successive stages," the first of 292 which declared that the State should "make it possible for each family to amortize the house in which they live with what they are presently paying for rent, within a period of not less than five years nor more than twenty years, according to the year in which the property was built." This was to be accomplished by the sale of the properties to the tenants or occupants *322 of the properties. By Article 5 all lease and sub-lease contracts covering urban realty existing on the effective date of the Urban Realty Reform Law were declared null and void, and by Article 7 Provincial Urban Reform Boards were created "to handle all questions of a civil or social nature arising from the application of this law and which are connected with the purchase and sale contracts the execution hereof [whereof] is hereby ordered." As the first step toward the accomplishment of the end sought, the Law in Article 8 contained a mandate that "Every owner of urban realty shall be required to declare under oath, before the competent Provincial Urban Reform Board, the real estate owned by him or her and the rental earned by it." It also carried a provision requiring that the tenant of every urban real property "shall declare under oath before the competent Provincial Urban Reform Council, [6] the particulars of such tenancy." *323 In Article 9, it was provided that the Provincial Urban Reform Boards should execute and issue the "purchase-sale contracts" to the tenants and the general rule was that the execution of the said purchasesale contracts would "whenever possible" follow the order in which the tenant filed the declaration required of him by Article 8. The price, which was to be paid by the tenant-purchaser in monthly installments, was to be determined by the formula set out in Article 15. The amount of the monthly installment was to be based on the monthly rental being paid for the property as of the effective date of the Law, and the period of time over which such monthly installments were to be paid was to be based on "the date of construction of the property" or, stated otherwise, the age of the property. As to the effect of the Urban Realty Reform Law as it related to the ownership of rental properties, the parties have stipulated that "Said intervention decree [Urban Realty Reform Law] divested the petitioner of his two rental properties." According to Black's Law Dictionary, Revised Fourth Edition, "divest" is equivalent to "devest," and "devest" means: "To deprive; to take away; to withdraw. *324 Usually spoken of an authority, power, property, or title; as the estate is devested." Based on the stipulation and the provisions of the Law itself, we have concluded and have found as a fact that after October 15, 1960, the effective date of the Law, Bosch no longer had any proprietary rights in or ownership of the two rental properties. All of his rights in and to the properties themselves were gone. There was no right to recover the properties. The Urban Realty Reform Law did contain a general scheme designed to provide some indemnity to Cuban nationals who were so divested of their properties. As a part of this general scheme it was provided by Article 21 that the prior owners of the properties so divested were to receive from the said Boards "the price respectively fixed in installments equal to those which the buyers may be under the obligation to pay" and by Article 28 it was provided that the Boards "shall be required to deliver to the former owners the portions of the price received by them according as they receive said payments." There was, however, in Article 22 a limiting provision as to the amount of the payments the former owners might receive in that "all amounts *325 over and above the total sum of $600.00 per month" were to "pertain to the State." And while the provisions of Article 21 standing alone did appear to provide the prior owner of urban realty with an unqualified right to receive indemnification payments for the property of which he had been divested under the Law, and similarly the provisions of Article 28 did appear to assure his receipt of monthly payments as the tenant-purchaser made his payments to the Urban Reform Board, there were the prior mandatory requirements and obligations on his part, a specific requirement being the requirement of Article 8 that he "declare under oath, before the competent Provincial Urban Reform Board, the real estate owned by him * * * and the rental earned by it." 293 Under the general scheme of the Law it was this declaration by the prior owner and the declaration by the tenant under oath before the competent Provincial Urban Reform "Council" of the particulars of his tenancy which were to supply the facts specified by Article 15 as the basis for computing the price the tenant was to pay under the purchase-sale contract for the property and the payments the prior owner was thereafter to receive. *326 These mandatory acts were not mere formalities but, being essential to the accomplishment of the purposes of the Law as well as its effective administration, were, in our opinion, prerequisites, which thereby took on substantive attributes. Furthermore, and as a part of the general scheme in making the mandatory requirements effective, there were the penal and administrative sanctions provided by Articles 44 and 45. By Article 45, it was provided that, "Independently from the 'penal sanctions' prescribed by this Law for the violators thereof, such violators shall be liable, in any case, as an administrative sanction applicable by the Urban Reform Boards created by this Law, to the forfeiture of the rights thereby recognized, and to the transfer to the State, when proper, of the title to the property in question." The "penal sanctions" referred to in Article 45 have reference to Article 44 which is to the effect that "Any action or omission rights and obligations established by this designed to infringe, default, or void the Law, shall be punishable by imprisonment for thirty-one to one hundred and eighty days, or fine of thirty-one to one hundred and eighty quotas, or both penalties. *327 " The petitioners argue that Bosch, as did other Cuban nationals who were land owners, as of the date of divestment of his properties, had valuable rights in the form of claims under the existing provisions of Cuban Law [the Urban Realty Reform Law] to specific indemnification payments from the Cuban Government, that the Law contained a formula for determining the amounts to be paid to such prior owners for their properties, "which formula was sufficient to compute the price to the dollar," and that "the promise of compensation was unequivocal"; and, in respect of such right to indemnification, Bosch had a reasonable expectation of realization thereon until the "decree of confiscation" by Law 989 became effective on December 6, 1961, which thereby became the date of the losses incurred by him in respect of his rental properties as well as the partnership interest in the textile manufacturing company. They have stipulated, however, that "in practice" a claimant, "to be entitled to indemnification," had to be a resident of Cuba at the time of filing his claim and at the time of receiving each of his monthly indemnification payments, also that Bosch had never filed a claim for indemnification *328 with the Cuban Government for the loss of his two rental properties. We have carefully examined the Urban Realty Reform Law and have found no provision whereunder the filing of a claim, at least the filing of a claim as such, by the prior owner of divested property was a prerequisite to a right to indemnification for the property of which such owner had been divested. There was, however, the mandatory requirement under Article 8 for his declaration of ownership under oath before the competent Provincial Urban Reform Board of the real estate owned by him and the rental earned by it. Actually we would not view it as far-fetched to regard the reference to the filing of a claim for indemnity as being the same as the making of the declaration required by Article 8. Whether or not the parties were referring to the required declaration when they entered into the stipulation that Bosch had never filed a claim for indemnification, there is no evidence, claim or contention that Bosch has ever filed the declaration required of him by Article 8 with respect to the properties herein. As a matter of fact, we think that the petitioners have in effect admitted that by reason of those requirements *329 Bosch at no time had a subsisting right or reasonable prospect of ever receiving the indemnity generally provided for the owners of properties such as his under the Law. They agreed and stipulated with respondent that, "Had the petitioner met all of the provisions required for indemnification he would have been entitled under the decree to $570 peso dollars per month for 15 years," that "the official and effective rate of exchange in 1960 was one United States dollar for one peso dollar" and the "value of an unrestricted right to $570 United States dollars per month for 15 years * * * is $80,267 United States dollars." From the facts of record and taking into account the purposes and provisions of the 294 Urban Realty Reform Law by which Bosch, on October 15, 1960, was divested of his two rental properties, it follows, we think, that in place of the said properties he had, at the most, an embryonic money claim which, even if, for the purpose of argument, it be assumed that it was a subsisting claim as of that date, would have had a value of no more than $80,267 United States dollars. See in that connection, Reg., sec. 1.165-1(d)(2)(ii). [7] As stipulated by the parties, the adjusted *330 basis of Bosch for the two properties was, in aggregate amount, $149,400. It accordingly follows under the holding in New Colonial Ice Company, Inc. v. Helvering, supra, that it is the burden of the petitioners to show that after they became resident aliens in the United States, Bosch, on October 24, 1960, and up to December 6, 1961, had a subsisting claim to indemnity payments of 570 Cuban pesos per month over a period of 15 years, or in any other amount, "with respect to which there [was] a reasonable prospect of recovery," which claim or right was lost by confiscation under Law 989 when it became effective on December 6, 1961, thereby entitling them to a deduction therefor under section 165(a), supra. Our attention has been called to a number of District Court cases dealing with the deductibility by Cuban nationals who were resident aliens *331 in the United States of losses resulting from the divestment under the Urban Realty Reform Law of Cuban properties belonging to them, namely, Garrigo v. United States, 296 F. Supp. 1110, United States District Court for the Northern District of Texas, decided November 12, 1968; Vila v. United States 301 F. Supp. 1004, United States District Court for the Southern District of Florida, decided March 20, 1969, appeal filed (C.A. 5, June 2, 1969), dismissed August 21, 1969; Alvarez v. United States, United States District Court for the Southern District of Florida, decided June 29, 1969, appeal filed (C.A. 5, Sept. 5, 1969); and the consolidated cases of Beltran v. United States and Onetti v. United States, decided September 29, 1969, by the United States District Court for the Northern District of Illinois, appeal filed (C.A. 7, Dec. 23, 1969). In the consolidated cases of Beltran and Onetti, the most recently decided of the above cases, both Beltran and Onetti, as was Bosch, were Cuban nationals residing in Cuba and were divested of rental realty, located in Havana, by the Urban Realty Reform Law when it became effective on October 15, 1960. No mention is *332 made of the filing of a "claim" for indemnity by either Beltran or Onetti but the facts show that they did timely make and file declarations of the real estate owned by them and the facts with respect to them as mandatorily required by Article 8 of the said Law. They did not appear before the Reform Board and make the declarations in person but did so through agents who managed the properties for them, and the facts show that the declarations so made and filed were accepted by the Board as meeting the requirements of the Law. Upon acceptance of the declarations, the Urban Reform Board began issuing monthly checks of $58 to $60 to Onetti and of $600 to Beltran. Onetti resided in Camaguay Province, 300 miles from Havana, and the checks issued to him "were held for him" by a Havana "office of the National Bank of Cuba." He came to Havana in May of 1961 and upon arrival received and cashed the checks so issued and held for him. Presumably he remained in Havana until shortly before September 9, 1961, when the Onettis entered the United States at Miami, Florida, from Kingston, Jamaica, pursuant to an immigrant visa issued on or about September 6, 1961. In the meantime Onetti had received *333 and cashed monthly checks of the same amount from May through August of 1961 at the offices of the National Bank of Cuba. The Onettis became resident aliens of the United States on September 9, 1961, and have remained United States residents "until the present time." They became United States citizens on February 21, 1967. Beltran entered the United States at Miami, Florida, on October 23, 1960, from Cuba on a non-immigrant visa issued at Havana, Cuba, on April 11, 1957, and valid through April 10, 1961. He became a resident alien of the United States on the date of his entry and has since remained in the United States as such. With respect to the 295 monthly checks for $600 issued in his name under the "Law of Urban Reform," the stated facts were that although so issued "no checks were ever cashed by him." [8]
*334 The facts as found by the Court in the Beltran and Onetti cases further show that: "Since 1959, the convertibility of Cuban pesos into foreign currency was restricted, pursuant to the application of the Exchange Control Regulations. By virtue of these regulations, it was not possible for a nonresident to have his compensation checks mailed abroad. This, however, did not affect ownership or right to dispose of the compensation which could be freely used for any purpose within Cuba." Another finding of the Court was that: "Neither Beltran nor the Onettis were at any time associated with the enemies of the Cuban Government or otherwise wanted by the police. They were free to travel in and out of Cuba throughout the period in issue," and further they "did not intend to nor did in fact abandon their rights to the real estate or any claim for compensation they had with respect to it. Each took every reasonable step to preserve and protect their interest in the property." Concluding and finding as a fact that Beltran and the Onettis possessed on October 14, 1960, and at all times prior to December 5, 1961, a reasonable prospect of receiving compensation of substantial value for the *335 losses of their rental estate, the court held that Beltran on December 5, 1961, pursuant to section 165 of the Internal Revenue Code, sustained a deductible loss of $131,781.33, which was, on December 5, 1961, the adjusted basis of the real estate taken on October 14, 1960, by the Cuban Government pursuant to "the Law of Urban Reform" and that, similarly, Onetti had sustained a deductible loss on his Cuban property in the amount of $12,020. In the instant case, not only is there no evidence of record but we find no claim or contention on the part of petitioners that Bosch ever made the declaration as to the ownership of the properties of which he was divested, as required by Article 8, or that any indemnification checks were ever issued in his name. Neither is there any evidence or claim that the Cuban Government in its interpretation and administration of the Urban Realty Reform Law ever recognized or construed the Law to provide that as of October 15, 1960, its effective date, any Cuban national whose property had been divested thereby and who did not timely make or cause to be made a declaration under Article 8 with respect to his property, which was acceptable *336 to the proper Board, had any right to be indemnified under the formula set forth in Article 15 of the Law and in keeping with Articles 21 and 28 to receive the monthly payments paid over by the tenant-purchaser, as the petitioners here contend was the right of Bosch. In that connection we do have, as noted above, the stipulation of the parties that "in practice, to be entitled to indemnification a claimant had to be * * * a resident of Cuba at the time of receiving each of his monthly indemnification payments" and there is no showing that in interpreting and administering the Law the Cuban authorities ever recognized that a prior owner of property, of which he had been divested, had any right to receive any indemnity checks, even though issued, except in Cuba and in person. Such being the state of the record, it may not be said in the instant case, as was said of Beltran and Onetti, that Bosch took every reasonable step to preserve and protect his interest in the properties of which he had been divested. And, whereas in the Beltran and Onetti cases the court found that neither Beltran nor Onetti was at any time associated with the enemies of the Cuban Government or otherwise *337 wanted by the police, in the instant case the parties have stipulated that, "Both prior to departing from Cuba and after arriving in the United States, [Bosch] actively opposed the political and social regime of Fidel Castro," and that he had no intention of returning to Cuba "until there was a change in the political climate existing in Cuba at that time." There is the stipulation that Bosch "could have returned to Cuba at any time during 1960 or 1961," but there is no showing that advisedly or prudently he could have returned. Be that as it may, the petitioners have stipulated that neither of them "has ever returned to Cuba." 296 As to the significance of the argument that petitioners intended to stay away from Cuba only so long as the political climate existing in Cuba at the time of their departure prevailed and the inference that upon change Bosch would return to Cuba and collect the indemnification payments or possibly recover his property, it does not, in our opinion, follow that the overthrow of Fidel Castro or a change in the social regime under him would establish or indicate that the resulting political and social regime would be any more favorable or even as favorable *338 to Bosch as to the recovery of the property of which he was divested or the collecting of indemnity thereon. See in that respect the subsequent changes in government which occurred as shown in Rozenfeld v. Commissioner, 181 F. 2d 388. In leaving Cuba on October 24, 1960, under the conditions and circumstances shown, we conclude that Bosch took that step with knowledge of the Urban Realty Reform Law and its impact, and in leaving did so with a full realization that he was turning his back on or abandoning any reasonable prospect of ever having a subsisting right to the indemnity which could have been his had he "met all the provisions required" therefor under the Urban Realty Reform Law. We accordingly conclude and hold that the petitioners have not shown that at any time after Bosch became a resident alien of the United States he had a subsisting right to indemnity payments, with respect to which there was a reasonable prospect of recovery, for the Cuban properties of which he had been divested on October 15, 1960, so as to be "nationalized by confiscation, in favor of the Cuban State," on December 6, 1961, the effective date of Law 989. New Colonial Ice Company, Inc. v. Helvering, supra. *339 See and compare Garrigo v. United States, 296 F. Supp. 1110, United States District Court for the Northern District of Texas, decided November 12, 1968, where on facts similar for the most part the court reached the same result. The facts in Alvarez v. United States, supra, are in pertinent respects similar to those in Onetti v. United States, supra. Although in Alvarez the court did not mention as such the declaration required under Article 8 of owners of rental property of which they had been divested, it did in its findings of fact state that, "The plaintiffs herein had chosen to receive payments as offered under the said Urban Reform Law and had been receiving payments from October 31, 1960 through May 31, 1961 in the amounts of two hundred dollars ($200.00) per month," and that Alvarez chose "to temporarily leave Cuba because of the unstable political climate * * * and had fully intended to return." The court held that the loss by Alvarez was sustained on "December 5, 1961" by virtue of Cuban Statute 989, as did the court in the Onetti case. What we have said in distinguishing the instant case from Onetti is, we think, applicable with respect to Alvarez. In *340 Vila v. United States, the facts as found by the court more nearly parallel the facts in this case. Although the court did conclude that Vila did have a right of indemnity which subsisted until December 6, 1961, when she was stripped of that right by the Cuban confiscation law known as Law 989, its decision was against the claimant on the ground that the loss which occurred by the confiscation was "the taking of a right of indemnity for which no claim of loss" had been made "and with respect to which no evidence has been offered to support a deduction therefor." As indicated heretofore, an appeal was filed in that case in the Court of Appeals for the Fifth Circuit on June 2, 1969, but was dismissed on August 21, 1969. With respect to the Vila, Alvarez, and Beltran and Onetti cases, suffice it to say that whether it be accepted that on its facts the instant case is distinguishable, or it is argued that the differences are not distinguishing differences, we are not only, not persuaded by any of those cases that the conclusions we have reached on the facts in the instant case are in error but to the contrary we are persuaded and convinced that the result, in law as well as in fact, *341 we have here reached is the required result. With respect to the 20 percent interest of Bosch in the textile manufacturing partnership, under Law 890, which became effective on October 15, 1960, and by which the interest of Bosch was nationalized by forceful expropriation," there was no plan or scheme, general or otherwise, for indemnification. In Article 7 of Law 890 as enacted by the Council of Ministers it was stated that "The measures and forms for payment of indemnity to the natural or legal persons affected by the expropriation provision of the Law will be regulated by a future Law" and 297 "to that effect, the Central Planning Council will proceed to place before the Council of Ministers within as short a time as possible the corresponding project providing for such Law." At best the existence of a right or claim to indemnification for the properties so confiscated was subject to the happening of a condition subsequent, namely, a later enactment to provide for indemnification, and the extent and conditions therefor. It is sufficient, we think, that the record shows that the condition subsequent was never satisfied either prior to the departure of Bosch from Cuba or *342 after he became a resident alien in the United States. At no time did Bosch ever have a claim against the Cuban Government for the confiscation of his partnership interest "with respect to which there [was] a reasonable prospect of recovery." See Regulations, Section 1.165-1(d)(2)(ii), supra. We so conclude and hold. Decision will be entered for the respondent. Footnotes
1. Generally the parties have referred to all such laws as decrees, and have stipulated that, "All decrees issued by the Cuban Government during 1960 and 1961 were effective upon publication in the Official Gazette of the Republic of Cuba." Also by stipulation, an English translation of the Law was made a part of the record as Exhibit 1-A.↩
2. The record shows that with respect to the two rental properties reference to the "October 14, 1960 decrees" is to the Urban Realty Reform Law voted on October 14, 1960, but which became effective on October 15, 1960, when published in the Official Gazette, and with respect to the partnership interest to Law 890 which likewise became effective on October 15, 1960. The reference to the "December 6, 1961 decree" is to Law 989 which became effective on that date.↩
3. Generally throughout their briefs counsel for both parties mistakenly refer to October 14, 1960, as the effective date of the said Law.↩
4. As shown on the return for the year ended January 31, 1965, for net loss carryover purposes the loss in respect of the three properties in aggregate amount was claimed to have been $464,853.60 and as claimed in the petition was $402,265.↩
5. Income Tax Regulations, Sec. 1.165-1. Losses. (d) Year of deduction. (1) A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year. * * * (2)(i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claims, by an adjudication of the claim, or by an abandonment of the claim. When a taxpayer claims that the taxable year in which a loss is sustained is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release. (ii) If in the year of the casualty or other event a portion of the loss is not covered by a claim for reimbursement with respect to which there is a reasonable prospect of recovery, then such portion of the loss is sustained during the taxable year in which the casualty or other event occurs. * * *↩
6. Presumably this reference is to the Provincial Urban Reform Board and could be an error in translation. We find no other mention of an Urban Reform Council in the Urban Realty Reform Law, according to the English translation, which is in evidence.↩
7. The Regulation provides that, "If in the year of the casualty or other event a portion of the loss is not covered by a claim for reimbursement with respect to which there is a reasonable prospect of recovery, then such portion of the loss is sustained during the taxable year in which the casualty or other event occurs."↩
8. Since, according to the facts found by the Court, the "Council of Urban Reform, in compliance with the terms of the Law," did not begin to issue compensation payments to former owners until several months after the enactment of the Law, and Beltran became a resident alien of the United States on October 23, 1960, only eight days after the effective date of the said Law and has since "remained a United States resident alien until the present time," it would appear that Beltran had been in the United States for some time prior to the issuance of the checks and may have been in the United States at the time the declaration required by Article 8 with respect to his rental properties was made by his agent.↩