CAYETANO R. RIBAS AND BERTHA M. RIBAS, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 836-69. Filed June 22, 1970.

[16] See also *Lyta J. Morris*, T.C. Memo. 1966-245.

*Fernando J. Freyre* for the petitioners.
*A. A. Simpson, Jr.,* for the respondent.

OPINION

This case presents the question whether petitioners are entitled to a loss deduction, pursuant to section 165,[2] with respect to Cayetano's business properties. They left Cuba and became resident aliens of the United States on December 31, 1961. If the losses were sustained subsequent to the time they became such resident aliens, respondent concedes that petitioners are entitled to a deduction. Contrariwise, petitioners concede that they are not entitled to a deduction if the losses were incurred prior to that time. Thus, the sole issue is when were the losses incurred.

Petitioners maintain that the losses were not incurred prior to January 29, 1962, when their exit permits from Cuba expired and when the properties became subject to confiscation. Respondent contends that, for all practical purposes, petitioners abandoned their properties upon their departure from Cuba and that the losses were sustained at that time.

The issue herein is purely factual and depends upon an analysis of a variety of factors—the practicality of ownership and control, rather than simply the retention of legal title, and the objective elements of the situation as well as the taxpayers' intent. Thus, the standard for determining the proper year for a loss deduction is a flexible one which varies in light of the circumstances of each case. See, e.g., *Boehm* v. *Commissioner*, 326 U.S. 287 (1945); *A. J. Industries, Inc.* v. *United States*, 388 F.2d 701 (Ct. Cl. 1967); *Rozenfeld* v. *Commissioner*, 181 F.2d 388 (C.A. 2, 1950); *Coastal Terminals, Inc.*, 25 T.C. 1053 (1956).

Cayetano, whom we found to be a sincere and straightforward witness, testified that he did not know what he was going to do when he left Cuba, his aim being simply to get out; that one of the reasons he did not attempt to sell the properties before leaving was that

---

[2] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \* \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

he would have nothing if he returned; and that he would have immediately returned to Cuba if the Castro regime had been overthrown. While petitioners formed a sufficient intention as to the period of their stay in the United States to require the conclusion that they became resident aliens on December 31, 1961, it does not necessarily follow that such intention must be equated with an intention to abandon the properties. To be sure, Cayetano was fully aware of the consequences of his failure to return to Cuba within 29 days, but we think this at most indicates that Cayetano had a *conditional* intention to abandon the properties.

Objectively, we note that Cayetano left a foreman in charge of the properties. Moreover, no confiscation had taken place and there is not the slightest indication that the Cuban government had intervened or otherwise deprived Cayetano of his control of the properties prior to the end of 1961. Indeed, under the Cuban law then in effect, the properties could not legally be confiscated until January 29, 1962, and a qualified expert testified that it was not the custom of the Cuban government to confiscate properties of departed citizens prior to the expiration of the statutory period. Furthermore, petitioners could have returned to Cuba under Cuban law during the 29-day period, although they would have had to apply for new exit permits to again leave Cuba.[3]

The possibility of petitioners' returning to Cuba in the near future was admittedly not very great but we do not think that this fact alone is sufficient to enable respondent to construct the double presumption of intent to abandon and actual abandonment at the time of departure and thereby require us to hold against petitioners. We think respondent's reliance upon the "incorrigible optimist" doctrine of *United States* v. *White Dental Co.*, 274 U.S. 398 (1927), is misplaced. Whatever may be the reach of that doctrine in evaluating the possibility of recovery after an actual seizure, we do not think it must be converted into a rule which necessarily characterizes a taxpayer as an "incorrigible pessimist" when a seizure is in the offing but has not occurred.

We think it significant that, with one exception, all of the decided cases in the area involved herein are predicated upon an actual seizure of ownership or control by representatives of the foreign gover-

---

[3] Respondent contends that petitioners could not have departed from the United States because of 22 C.F.R. sec. 46.2(a) (1970 ed.), which provides that, "No alien shall depart, or attempt to depart from the United States if his departure would be prejudicial to the interests of the United States under the provisions of § 46.3," which places within this category, "(k) Any alien lawfully admitted for permanent residence who seeks to depart from the United States for travel to, in, or through * * * Cuba." Par. (k) was added to sec. 46.3 by 25 Fed. Reg. 12289 (1960), but we find no evidence that Cuba was included on this list until the amendment of par. (k) by 27 Fed. Reg. 1358, published on Feb. 14, 1962, which was subsequent to the period in question.

ment. Respondent himself has considered some form of seizure as the touchstone. Compare Rev. Rul. 64–149, 1964–1 C.B. 233, and Rev. Rul. 62–197, 1962–2 C.B. 66. In the one case where no seizure occurred, the taxpayer was held not to have sustained a loss at the time of departure.[4]

Perhaps the losses herein occurred prior to the expiration of the 29-day period. Compare *Charles Gutwirth*, 40 T.C. 666, 676, (1963); *Eugene Houdry*, 7 T.C. 666 (1946). It is at least open to argument that Cayetano should be considered to have abandoned the properties instanter upon his obtaining resident alien status. But we think that petitioners have sustained their burden of proof that the losses did not occur *prior to that time*. Even if the losses are considered to have been sustained on December 31, 1961, petitioners would appear to be entitled to carry them forward to the taxable years involved herein under section 172(b)(1)(D) and respondent has not argued otherwise.

In order to reflect the agreement of the parties as to the measure of the loss deduction,

*Decision will be entered under Rule 50.*

---

[4] See *Stanislaw Mikolajczyk*, T.C. Memo. 1955–165. Compare also *Alvarez v. United States* (S.D. Fla. 1969, 24 A.F.T.R. 2d 69–5360, 69–2 U.S.T.C. par. 9618); *Beltran v. United States* (N.D. Ill. 1969, 24 A.F.T.R. 2d 69–5753, 69–2 U.S.T.C. par. 9649); *Vila v. United States*, 301 F. Supp. 1004 (S.D. Fla. 1969); and *Garrigo v. United States*, 296 F. Supp. 1110, 1115 (N.D. Tex. 1968); *Ramon Rodriguez-Torres*, T.C. Memo. 1970–76; *Luis Bosch*, T.C. Memo. 1970–66.