ALBERTO HERNANDEZ and ZOILA CASTRO (formerly ZOILA HERNANDEZ), Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Repondent
Hernandez v. Commissioner
Docket No. 2994-71.
United States Tax Court
T.C. Memo 1972-241; 1972 Tax Ct. Memo LEXIS 15; 31 T.C.M. (CCH) 1197; T.C.M. (RIA) 72241; December 5, 1972, Filed Manuel Zaiac, for the petitioners. Richard G. Holloway, *16 for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined deficiencies in petitioners' income tax as follows: Year
Deficiency
1966
$ 720.79
1967
1,112.14 The sole issue for decision is whether petitioners were entitled to net operating loss deductions in 1966 and 1967 in respect of losses incurred by petitioner Alberto Hernandez prior to such years by reason of the expropriation of certain assets by the government of Cuba. The answer depends upon (1) whether the losses were attributable to a "trade or business" of Alberto Hernandez, within the meaning of section 172(d) (4), I.R.C. 1954; (2) whether the losses were sustained subsequent to the time petitioners became resident aliens of the United States; and (3) the measure of such losses and the extent to which such amounts, if otherwise deductible in 1966 and 1967, exceeded petitioners' aggregate taxable income from prior years against which such losses could have been applied. FINDINGS OF FACT The parties have filed a stipulation of facts which, together with accompanying exhibits, is incorporated herein by this reference. Petitioners Alberto Hernandez *17 and Zoila Castro were formerly husband and wife. They were still married to one another during the years 1966 and 1967 and filed a joint Federal income tax return for each of such years with the district director of internal revenue at Jacksonville, Florida. Petitioners both resided in Miami, Florida, at the time they filed their original petition, and first and second amended petitions, herein. Petitioners were Cuban nationals residing in Havana, Cuba, at the time the forces of Fidel Castro effectively assumed political control of that country early in 1959. The Castro government's allegiance to communism had become well known by the end of 1961. Alberto Hernandez ("Hernandez" or "petitioner") felt that he could not remain in Cuba under such a regime. He and his wife applied for exit permits to leave Cuba for the United States, and such permits were issued them by the Cuban government. A few months thereafter, on June 16, 1962, they departed Cuba and arrived in the United States. They were granted admittance as "parolees" under the immigration and naturalization laws of this country, and they became "resident aliens" of the United States for purposes of our tax laws upon the date *18 of their arrival here. At the time he left Cuba Hernandez was determined never to return there as long as the Castro regime remained in power, but he believed that a Cuban counter-revolution of some sort was imminent, and he thus hoped to be able to return to his homeland within a few months. His expectations in this respect proving to be ill-founded, petitioner never returned to Cuba. He has continued to reside in the United States and has since become a citizen of the United States. The Hernandez' exit permits had been issued under Cuban law No. 989, which was promulgated pursuant to effective authority on December 5, 1961. Law No. 989 provided for the granting of exit and reentry permits to persons desiring to leave Cuba for fixed periods of time. Pursuant to another Cuban law, the authorized period of absence for persons traveling to the United States was 29 days. The Hernandez' exit permits were so restricted by their own terms. Law No. 989 further provided that persons who failed to return to Cuba within the period for which their absence had been authorized would be considered as having permanently abandoned the country, and that all of the property of such persons would *19 be considered nationalized through confiscation to the benefit of the Cuban State and assigned to the appropriate government agency. To facilitate the administration of these provisions, agents of the Cuban government customarily made an inventory of the property of prospective travelers abroad after they had been issued exit permits. Once property was listed in an inventory, the owner was no longer free to sell it or give it away, and persons were required to account for all of their inventoried belongings before leaving Cuba. Although physical control of such property was sometimes assumed by the Cuban government, or its agents, before a person left the island or shortly thereafter, persons who returned to Cuba within the appropriate time were legally entitled to the return of their property. Any such recovered property, with the exception of real property and certain items of personalty not here relevant, could have been freely sold. In practice, however, the aforementioned provisions of law No. 989 were not always followed. Government agents who were assigned the duty of making complete inventories frequently omitted certain articles from such lists and wrongfully diverted them *20 to their own private use. Those who were leaving Cuba were often pressured into making official declarations that they planned not to return, even where their true intentions were otherwise, and confiscation of their belongings was thus expedited. And persons who returned to Cuba within a period of time which should have entitled them to the return of their property were not always treated in accordance with law. There was ordinarily little difficulty in securing the return of business property, for the tangible assets in business offices were usually left in place when their owners left Cuba, and such enterprises were merely taken over at once by the Cuban government without other changes. Other personal property, however, was commonly confiscated by the government, or its agents, prior to the expiration of the period during which the owner was legally absent from Cuba. In such cases reacquisition was nearly impossible. The owner could lodge a claim against the government in the nature of replevin or for monetary damages, but such actions were not always successful. Finally, where persons failed to return to Cuba within the required time, thus forfeiting their assets to the government *21 under law No. 989, such property was often not actually seized until some months subsequent to the expiration of the authorized time for the owner's return. What would happen in a case where the owner somehow returned to Cuba after he was legally permitted to, but before his property had been physically taken, is not shown on the record. For their part, persons desiring to leave Cuba often acquiesced in the illegal appropriation of some of their property by government agents in order to mitigate official resistance to their proposed departures. And in numerous instances persons concealed the existence of certain of their belongings from Cuban officials responsible for making complete inventories. A failure to make complete disclosure in respect of one's property was illegal under law No. 989. Such an offense was punishable by death in the case of sequestered items in the nature of money, although where other kinds of assets were hidden the owner might only be imprisoned or forbidden to leave the island. However, concealments of this sort were often not discovered by the government until substantial periods of time had elapsed. In such cases no effective confiscation of the property *22 took place until after its existence became known to the government, irrespective of when the right to the property theoretically was forfeited under law No. 989. Whether a returning Cuban could, in practice, reacquire the beneficial use of property he had hidden prior to his departure is not made entirely clear by the record. Apparently, such a person -- or, for that matter, anyone who happened to obtain possession of concealed assets -- might at least have been able to dispose of certain kinds of property on the Cuban black market, which seemed to be quite active during this period of Cuban history. The record is also incomplete as to whether such assets might have been removed from Cuba, surreptitiously or otherwise, and retrieved by their owners abroad. Alberto Hernandez' occupation in Cuba had been the practice of public accounting. He had first been licensed as a public accountant by the government of Cuba in 1947, and in 1957 he established a sole proprietorship for his practice and rented space for himself and his small staff in an office building located in Muralle Street in Havana (the "Muralle Street Offices"). The firm still occupied these quarters as of the time petitioner *23 left Cuba in June of 1962. Hernandez then had four or five employees in his practice in addition to himself, and his business offices contained numerous items of tangible property. The table below contains a summary of the assets in petitioner's Muralle Street offices on June 16, 1962, -- the date of Hernandez' departure from Cuba -- together with estimates he made of original costs, accumulated depreciation, and book values. Such estimates were made entirely from petitioner's recollection; he had made no attempt to bring any business records or other documents of substantiation with him from Cuba, because it was his understanding that he would have been refused permission to leave the island if such materials had been discovered at the time of his departure. The table just described, with figures in Cuban pesos, is as follows: Original
Accumulated
Book Asset class
Cost
depreciation
value
Furniture
6,600.00
1,895.00
4,705.00
Other storage facilities
2,200.00
747.50
1,452.50
Leasehold improvements
6,000.00
1,950.00
4,050.00
Books
2,100.00
680.00
1,420.00
Machinery & equipment
7,350.00
2,100.00
5,250.00
Other supplies
475.00
475.00
Air conditioning units
3,500.00
925.00
2,575.00
28,225.00
8,297.50
19,927.50
*24 The cost figures above represent petitioner's estimates of the prices he had paid. All of the assets were purchased in 1957 and subsequent years. Certain "free" market rates of exchange, as stipulated to by the parties, were as follows: Cuban pesos per U.S. dollar at end of month
1957
1958
1959
1960
1961
1962
1963
January
1.00
1.00
1.15 1.67
5.50
5.65
20.00
February
1.00
1.00
1.25
1.75
6.00
6.00
20.00
March
1.00
1.00
1.18
1.95
6.25
6.50
2 5.00
April
1.00
1.00
1.20
2.22
6.25
7.00
25.00
May
1.00
1.00
1.25
2.45
6.25
7.50
25.00
June
1.00
1.00
1 .28
2.85
6.25
7.75
25.00
July
1.00
1.00
1.35
3.00
5.90
8.50
25.00
August
1.00
1.00
1.40
3.75
8.75
25. 00
September
1.00
1.00
1.44
4.50
5.00
11.00
25.00
October
1.00
1.00
1.42
4.75
5.25
12.00
25.00
November
1.00
1.00
1.57
5.00
5.35
20.00
25.00
December
1.00
1.00
1.65
5.25
5.50
22.50
25.00 The parties have further stipulated that the official dollar/peso rate of exchange during the years 1957 through 1962 was one-to-one. In Havana, Hernandez had lived in a rented home which was located away from the Muralle *25 Street offices. In 1962 the rent on both premises was payable to agencies of the Cuban government, and petitioner had paid all of his rent in full through the end of June, 1962, at the time he left Cuba on June 16. A few months prior to that date -- at about the time his exit permit was granted -- government agents came to his home to make the customary inventory of his belongings, pursuant to the proper implementation of law No. 989, as described above. Contrary to law, but with petitioner's consent, they removed a few portable articles from his house, apparently to appropriate them to their own use. The agents also inquired of Hernandez whether he owned any property not located in his house. In response to this inquiry, petitioner did not divulge the existence of the Muralle Street offices, for he had represented upon applying for his exit permit that his accounting practice was conducted out of his home. Therefore, no inventory of the assets in his accounting business was made prior to petitioner's departure. It was likely, however, that the government would eventually learn of petitioner's misrepresentations, because it was then the proprietor of the building in Muralle Street *26 where the accounting offices were, signs on the office doors identified the firm in petitioner's name, and the firm was listed in the telephone directory under petitioner's name. Such discovery was made, as described more fully hereinafter, but not until petitioner had been gone from Cuba for some time. Before he left Cuba Hernandez asked his brother-in-law, who was also a trusted former employee of his, to look after the affairs of the accounting practice on petitioner's behalf while he was out of the country. In addition, Hernandez and his principal employees executed a notarized document wherein petitioner delegated the management of the firm's business to the employees for the time he was to be away and they, in turn, agreed to continue working and apprise petitioner of business affairs. No provision was made therein for Hernandez to receive or be allocated any portion of the firm's profits or income while he was absent from Cuba, and petitioner had no intention or expectation of deriving any gain from the business as long as he remained in the United States. He has never derived, from any source in Cuba, income which was reported or taxable in this country. However, at the time *27 he left, petitioner had in mind that he would return to Cuba upon the hoped-for ousting of the Castro regime and resume his accounting practice within a short time. The firm continued to operate in Hernandez' absence for a period of time subsequent to June 16, 1962. Petitioner apparently corresponded with some of the employees after his departure. Two letters purporting to be from employees, which were received by petitioner shortly after his arrival in the United States, related certain financial difficulties the business was experiencing as well as certain other incidental matters. The employees acknowledged their continuing recognition of Hernandez as the proprietor of the firm, but they did not transmit to him any proceeds of the enterprise, nor did they indicate that such was in order. The Cuban government finally seized physical control of the Muralle Street offices early in January of 1963, when government agents entered the premises, ordered the occupants to vacate, and placed signs on the office doors designating the property therein as that of the Cuban agency in charge of expropriations. Petitioner has never been compensated for the taking of the assets which had been *28 used in his accounting practice. On or about April 10, 1967, petitioners signed and subsequently filed a document purporting to be their joint Federal income tax return for the taxable year ending December 31, 1962. They had filed no earlier return for such year. On the April 10, 1967, document, petitioners claimed a "net operating loss" of $24,500 in respect of the confiscated assets in Hernandez' former accounting firm. The $24,500 figure was computed as follows: Cash
$ 2,000
Accounts receivable
5,075
Other assets [1]
17,425
$24,500 No other deductions or items of income were reported on the document for the year 1962. The record contains no evidence to support the "Cash" or "Accounts receivable" items. Petitioners filed a joint return for the year 1963 on March 25, 1965. Their returns for the years 1964-1967, inclusive, were all timely filed. Only on their returns for 1966 and 1967 did they claim deductions in respect of the Cuban loss. However, on November 27, 1967, they filed two Internal Revenue Forms No. 843, claiming refunds of the full *29 amounts of tax they had paid for each of the years 1964 and 1965 by reason of net operating loss deductions to which they alleged they were entitled. The following table presents a summary of the relevant information in petitioners' tax returns, as adjusted to reflect the allegations made in the claim forms for 1964 and 1965: Net operating
Taxable
Taxable income per
loss deduction
income
returns (reduced
claimed on
before net
by losses claimed
returns or
operating Year
on Forms No. 843)
Forms No. 843
loss deduction
[2] 1962
0
0
0
1963
$1,160.05
0
$ 1,160.05
1964
0
$ 3,713.25
3,713.25
1965
0
4,953.01
4,953.01
1966
0
7,700.50
7,700.50
1967
3,064.70
6,973.19
10,037.89
$4,224.75
$23,339.95
$27,564.70 In his notice of deficiency to petitioners for each of the years 1966 and 1967, the Commissioner determined that: The loss carryover claimed from Cuban Confiscation [$7,700.50 for 1966 and $6,973.19 for 1967] has been disallowed since it has not been established that you are entitled to this deduction under Section 172 of the 1954 Internal Revenue Code. Petitioners have made no election under section *30 172(b)(3)(c) of the 1954 Code to have the special provisions of section 172(b)(1)(D), relating to foreign expropriation losses, apply.
OPINION RAUM, Judge: Petitioner contends that he sustained a business loss under section 165(a), (b) and (c)(1) of the Code in January, 1963, when the Cuban government allegedly confiscated the assets of the accounting business which he left behind at the time that he departed from Cuba (June 16, 1962), cf. Cayetano R. Ribas, 54 T.C. 1347, and that as a result of carryovers under section 172 he was entitled to net operating loss deductions for 1966 and 1967 which would have the effect of eliminating the deficiencies involved. The Government, on the other hand, argues that petitioner is not entitled to prevail on any one of three alternative grounds: (1) whatever loss was sustained occurred prior to petitioner's arrival in the United States on June 16, 1962; *31 (2) the loss if it occurred after that date was a non-business loss for which there are no carryforward provisions in the Code; and (3) the amount of the loss has not been substantiated in an amount sufficient to produce deductions for the tax years 1966 and 1967, after portions thereof have been absorbed in the years 1963, 1964 and 1965. We hold that the Government must prevail on the third ground, and we do not reach any of the difficult questions presented by the first two. Petitioners' net taxable income (before the claimed net operating loss deduction) for the years 1963-1965 was as follows: 1963
$1,160.05
1964
3,713.25
1965
4,953.01
$9,826.31 It was therefore incumbent upon petitioner to establish that the claimed confiscation loss was in an amount sufficiently in excess of $9,826.31 to support, in addition, the deductions of $7,700.50 and $6,973.19 which were claimed on the 1966 and 1967 returns, respectively. We cannot find on this record that the alleged loss was in excess of $9,826.31. Petitioner unfortunately had no records of the costs of the confiscated items, but he attempted to make approximations of such costs and the dates of *32 their respective acquisitions. These were nevertheless approximations and therefore call for the application of Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2), without, however, bearing "heavily" upon petitioner in view of the fact that the absence of records was not due to any fault on his part. Moreover, petitioner's cost estimates were in "pesos", not dollars, and although a peso was equal to a dollar under the "official" rate, the evidence shows that it occupied a far less favorable position in respect of the dollar on the "free" market at most of the dates in question. And it is the rate on the "free" market rather than on the "official" market that is controlling. Marko Durovic, 54 T.C. 1364, 1388-1390. It is of course not possible to make any precisely accurate determination of petitioner's adjusted basis in dollars in respect of the confiscated assets. But it is our best judgment under the Cohan rule, taking into account (a) the approximate costs of the various assets in pesos, (b) the conversion of such costs into dollars, and (c) the adjustments necessary to reflect depreciation, that the petitioner's adjusted basis in the confiscated *33 assets did not exceed $9,826.31. We so find as a fact. In the circumstances, there can remain no further amounts available as carryovers to the years 1966 and 1967. Decision will be entered for the respondent. Footnotes
1. Such other assets apparently represented the property referred to in the table at page , supra.↩
2. As mentioned above, petitioners' so-called return for 1962 disclosed only the "net operating loss" in the amount of $24,000. They claimed no deduction in respect to such loss for 1962, since they had no taxable income for such year against which the loss could be applied.↩