RAFAEL ALOMA SABAS and KEILA ALOMA SABAS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sabas v. Commissioner
Docket No. 6108-69.
United States Tax Court
T.C. Memo 1973-133; 1973 Tax Ct. Memo LEXIS 154; 32 T.C.M. (CCH) 578; T.C.M. (RIA) 73133; June 21, 1973, Filed Rafael Aloma Sabas, pro se. Michael A. Menillo, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined a $1,090.51 deficiency in petitioners' 1966 income tax. The only issue for decision is whether petitioners were entitled to deductions in respect of losses they incurred by reason of confiscatory acts of the Cuban government. 2 FINDINGS OF FACT The parties have filed a stipulation of facts which, together with an accompanying exhibit, is incorporated herein by this reference. Petitioners Rafael Aloma Sabas and Keila Aloma Sabas are husband and *155 wife. They filed a joint Federal income tax return for the calendar year 1966 with the district director of internal revenue at Brooklyn, New York, and resided in Brooklyn at the time they filed their petition herein. On March 1, 1962, petitioners came to the United States from their native country of Cuba, where Mr. Sabas had been engaged in the practice of law. Pursuant to the Cuban laws authorizing petitioners' emigration, all of their property would be expropriated to the benefit of the Cuban State if they failed to return to the island within 29 days. Petitioners left Cuba with the hope that some sort of invasion of Cuba might soon be mounted from the United States and lead to the overthrow of the Castro regime then in power, whereupon petitioners intended to return to Cuba. Shortly after their arrival in this country, however, petitioners concluded that no such events were likely to transpire for quite some time, if ever, and they thus decided to remain in the United States. 3 In 1958, petitioners had purchased certain bonds of the Republic of Cuba and 100 shares of stock in the Cuban Telephone Company. They paid the face and par values of the bonds and stock, *156 respectively, which are stipulated to have amounted to $14,000 and $10,000, respectively, in the aggregate. Interest at the rate of four percent per year was payable in respect of the bonds through December 31, 1980. The Castro government assumed political control of Cuba in early 1959. Petitioners received dividends on the Cuban Telephone Company stock until shortly before August 6, 1960, on which date the government ordered the nationalization of the Telephone Company through compulsory expropriation. On October 13, 1960, the Castro government nationalized all the banks in Cuba and suspended coupon payments on the bonds issued by the predecessor government. Recovery of the principal amounts of the bonds was thus placed in grave jeopardy as well, since they were to have been redeemed by a bank. Nothing in the record establishes that further payments or reparations of any sort have ever been made to holders of Telephone Company stock or Republic of Cuba bonds. After the 1960 acts of nationalization, however, there was a certain amount of random speculative trading in securities issued 4 prior to the advent of the Castro regime, but Mr. Sabas was unable to locate a buyer *157 for his securities before he left Cuba, and nothing in the record establishes that there was in fact any realistic possibility of selling pre-Castro Cuban securities after the time of petitioners' arrival in the United States. Petitioners received no payments in respect of their stocks or bonds after 1960. On their joint tax return for 1966, petitioners claimed a deduction in the amount of $28,413.20 for "Cuban Losses (Casualties) carried forward from 1965". The Commissioner disallowed that deduction in full. A schedule attached to the 1966 return indicated that the total amount of the claimed loss was $39,000 and that $10,586.80 of that amount had been applied against petitioners' other taxable income for 1964 and 1965. Petitioners had taxable income in 1963 of $3,000-$3,500, before the deduction of any possible net operating loss available in that year; such income was not taken into account in the computation for their 1966 return.An undisclosed portion of the claimed $39,000 loss related to petitioners' confiscated Cuban residence, in respect of which they now concede they were entitled to no deductions. 5 OPINION RAUM, Judge: The sole remaining issue is whether *158 petitioners sustained a deductible loss in respect of their Cuban stocks and bonds that may be claimed on their 1966 tax return. To establish their right to such a deduction under our tax laws, it was essential that petitioners prove that a loss occurred subsequent to the time they became resident aliens of the United States. Cf. Cayetano R. Ribas, 54 T.C. 1347. We hold that petitioners have failed to carry their burden of proof in this respect, and we express no opinion upon any of the alternative theories put forth by the Government in support of its position that the deduction must be disallowed. Petitioners have pointed out that Cuban laws in effect at the time of their emigration provided that their property would be deemed nationalized only upon the expiration of a 29-day period following their departure from the island. Their position is that the loss of their Cuban securities thus occurred 29 days after March 1, 1962, and that they had meanwhile become resident aliens of this country. But even if their contentions in respect of their attainment of resident alien status are sound, cf. section 1.871-2(b), Income Tax Regs., the expiration of the 29-day period *159 was only the latest time at which the loss might have occurred. If the securities became worthless during an earlier year, it is plain under 6 section 165(g) of the 1954 Code [1] that they must be treated as lost as of the end of that year. At the trial in this case, we called this rule to the attention of Mr. Sabas, and he stated his earnest belief that his stocks and bonds retained values at the time he left Cuba equal to their original purchase prices. But the circumstances in Cuba as revealed by the stipulated facts and Mr. Sabas' other testimony convince us, unfortunately, that the securities had in fact lost all value as a practical matter before petitioners came to the United States. Certainly, petitioners, who have the burden of proof, have not shown otherwise. *160 7 The 1960 nationalization of the Cuban Telephone Company and all the banks in Cuba, which had been chanrged with paying both principal and interest on Republic of Cuba bonds, rendered petitioners' securities prima facie worthless. Petitioners' position, as we understand it, is that the securities retained some value thereafter for any of three reasons: (1) the Castro government itself had promised to make reparations; (2) the overthrow of the Castro regime and restoration of the predecessor government was expected; and (3) the securities might have been sold to a speculator. No reparations, however, were proven to have been made, and Mr. Sabas' testimony was unclear in respect of specific conditions relating to the alleged promise of idemnification. We cannot realistically attribute any value to the securities on the basis of such a nebulous undertaking, if any, by the Cuban authorities. Nor did the toppling of the Castro government appear to be a realistic possibility at least as of the end of 1961. And the difficulties of gaining access to the speculative "market" on which petitioners hoped to sell their stock were indicated by Mr. Sabas himself. He had failed to locate *161 a buyer for his stock while he was in Cuba, and there is hardly reason to believe that he might have met with greater success in such an endeavor had petitioners returned to Cuba before the expiration 8 of their authorized period of absence. In the circumstances, the securities had obviously become entirely worthless as a practical matter, well before petitioners left Cuba, and we so find as a fact. Petitioners' reliance on Rev. Rul. 64-149, 1964-1 (Part I) C.B. 233, clarifying Rev. Rul. 62-197, 1962-2 C.B. 66, is misplaced. Nothing in that ruling suggests that a resident alien may claim a deduction in respect of a loss sustained prior to the time he established resident alien status in this country. Decision will be entered for the respondent. Footnotes
1. SEC. 165. LOSSES. * * * (g) Worthless Securities. - (1) General rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this substitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security defined. - For purposes of this subsection, the term "security" means - (A) a share of stock in a corporation; * * * (C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form. ↩