JOSE E. BELLO and ROSA C. BELLO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bello v. Commissioner
Docket No. 5127-71
United States Tax Court
T.C. Memo 1974-174; 1974 Tax Ct. Memo LEXIS 148; 33 T.C.M. (CCH) 747; T.C.M. (RIA) 74174; June 26, 1974, Filed. Harold Chopp, for the petitioners. Paul R. Stanton, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge : The Commissioner *150 determined a deficiency in petitioners' federal income tax for the calendar year 1967 in the amount of $844.37. The only issue for decision is whether petitioners are entitled to deductions under section 165(a) and 165(c) (1), Internal Revenue Code of 1954, [1] and section 172(a) in respect of losses they sustained from the confiscation of certain property by the Cuban Government. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts together with the attached exhibits are incorporated herein by this reference. Petitioners Jose E. Bello and Rosa C. Bello, husband and wife, resided at the time of the filing of their petition herein at West Palm Beach, Florida. Petitioners filed a joint federal income tax return for the calendar year 1967 with the district director of internal revenue at Jacksonville, Florida. We will hereinafter refer to Jose E. Bello as "petitioner." The petitioner owned a sole proprietorship known as "Transporte Bello", which consisted of two gas stations and a fuel transportation business. Petitioner *151 purchased six large tractor-trailer tank trucks at a total cost of $181,000 between 1956 and 1959. Petitioner also purchased 12 light trucks costing a total of $48,000 during and mid-1950's. During these years depreciation on trucks under Cuban law could be taken at the rate of 15 percent per year. The land on which one of the gas stations was built cost petitioner $15,000, with the building itself costing $8,000. Petitioner also owned a warehouse and various other machinery and equipment. Petitioner leased a second gas station from the Shell Oil Co. Prior to 1959 one American dollar was equal to one Cuban peso. After the Bay of Pigs invasion had failed and the political picture in Cuba was becoming more defined, the petitioners left Cuba on September 2, 1961, arriving in Jamaica, British West Indies, the same day. Petitioner left an employee in charge of his business on a day-to-day basis. At petitioner's request, his attorney Jesus M. Rojas-Fernandez (hereinafter "Rojas") kept an eye on the business. His visits to the business occurred frequently through November, 1961. It was petitioner's hope that profits from the business could be forwarded by Rojas to him in the *152 United States. On September 29, 1961, the Cuban Government issued Resolution 454, which was later published in the official government newspaper on October 9, 1961. Such resolution stated in part (as translated): I RESOLVE: FIRST: That citizens leaving the national territory for the United States of North America will be granted a permit for up to twenty-nine days; sixth days for travellers going to the other Countries of the American Continent; and ninety days for those who travel to the European Continent. If they should not return at the expiration of the permits, it shall be considered that they definitively abandoned the national territory and as a result the State shall procede to appropriate personal property, real estate and any holdings belonging to said person. During their stay in Jamaica, petitioners applied for and received permission to enter the United States as permanent residents. Petitioners thereafter arrived in Miami, Florida on November 2, 1961.They became resident aliens for United States tax purposes on November 2, 1961. Petitioners did not intend to return to Cuba. As of the end of November 1961, no overt act of confiscation in respect of petitioner's *153 business had taken place. On December 5, 1961, the Cuban Government issued law 989, which was published in the official government newspaper on December 6, 1961. As translated this law stated in pertinent part: Article 1. - * * * If the return does not occur within the period of time for which the departure was authorized it will be considered that there has been a final abandonment of the country. Article 2. - In the case of the persons covered by the second paragraph of Article 1, all personal property, real property, or any other property, rights of securities of any kind, belonging to them, shall be deemed nationalized pursuant to confiscation in favor of the Cuban State, and the property shall be assigned to the corresponding Government bureau. * * * Article 4. - Motorized vehicles, regardless of their category, which are referred to in the preceding article, shall be seized by the Ministry of the Interior and be transferred to the appropriate public organism. * * * Final Provision. - All legal provisions and regulations which are in opposition to the provisions of this law are hereby repealed and the law shall take effect on the date of its publication in *154 the Official Gazette of the Republic. An election under section 172(b) (3) (C) (iii) was attached to a claim for refund, Form 843, and was filed by petitioners on December 30, 1965, to have section 172(b) (1) (D) apply to their foreign expropriation loss for the calendar year 1961. OPINION The sole issue to be decided is whether petitioners are entitled to a loss deduction pursuant to section 165[2] and subsequent net operating loss carryovers under the provisions of section 172. [3] In order to qualify for such deductions the petitioners must show (1) the time of the loss; (2) the trade or business nature of the loss; and (3) the amount of the loss. *155 Nonresident aliens are permitted deductions only to the extent they are connected with income from sources within the United States. Section 873(a). It is therefore critical to petitioner's case that the loss in question took place after he acquired the tax status of a resident alien. Cayetano R. Ribas, 54 T.C. 1347 (1970). In this decidedly factual endeavor we are not able to perceive any significant differences between Ribas and the case at hand to warrant different treatment. The petitioner had a substantial investment in his business "Transporte Bello", consisting of two gas stations, many trucks, and other machinery and equipment. It therefore seems eminently reasonable that although petitioner departed Cuba for political reasons, he might attempt to retain control and an economic interest in his business. The record amply indicates that the business continued to operate smoothly in his absence, at the direction of Miss Morales, an employee, and because of frequent visits by Rojas, petitioner's attorney. The respondent has conceded that no overt confiscatory act by the Cuban Government took place until well after the arrival of the petitioners in the United *156 States. Cayetano R. Ribas, supra at 1350. Unlike Ribas, petitioner's intention was to remain in the United States and continue the operation of his Cuban business through agents. Had the political climate changed, petitioner's best intentions may have been carried into fruition. In retrospect the plan was unfeasable. Nevertheless, we find that petitioner did not abandon his business upon departure from Cuba, but rather the loss occurred after he attained resident alien status.[4]
Section 165(c) (1) and section 172(d) (4) (A) carry th e requirement that the loss must be incurred in a trade or business. The respondent has argued that it is not sufficient that a trade or business existed, but further it must be shown that there was a resonable expectation that the profits of such business be subject to taxation within the United States before *157 any loss deduction can be allowed. This difficult issue need not be resolved herein [5] because we have made the affirmative finding of fact that petitioner had a good faith profit motive after his arrival in the United States. Petitioner had requested his attorney to forward profits from the business to him in the United States. Had the profits been received, it is clear they would have been taxable under section 61. In determining the amount of petitioner's loss, we have borne in mind the circumstances of petitioner's departure from Cuba and the consequential difficulty in bringing forward normal business records. Petitioner's testimony established a reasonable cost basis in his business assets, which his attorney and respondent's own expert were able to corroborate. Nevertheless in his computed adjusted basis for loss purposes, petitioner did not account properly for *158 depreciation. Based on all the facts and circumstances we find petitioner's adjusted basis in the assets of "Transporte Bello" to be $115,000. Peter S. Elek, 30 T.C. 731 (1958); Benjamin Abraham, 9 T.C. 222 (1947). To reflect our findings herein, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated. ↩
2. Sec. 165. Losses. (a) General rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; * * *.↩
3. Sec. 172. Net Operating Loss Deduction. (a) Deduction Allowed. - There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term "net operating loss deduction" means the deduction allowed by this subsection. (b) Net Operating Loss Carrybacks and Carryovers. - (1) Years to which loss may be carried. - * * * (D) In the case of a taxpayer which has a foreign expropriation loss (as defined in subsection (k)), for any taxable year ending after December 31, 1958, the portion of the net operating loss for such year attributable to such foreign expropriation loss shall not be a net operating loss carryback to any taxable year preceding the taxable year of such loss and shall be a net operating loss carryover to each of the 10 taxable years following the taxable year of such loss (of, with respect to that portion of the net operating loss for such year attributable to a Cuban expropriation loss, to each of the 15 taxable years following the taxable year of such loss); * * *. ↩
4. Since the respondent has sought to minimize petitioner's net operating loss carryover from the year 1961 solely on the basis that the loss occurred before petitioner assumed the status in November of 1961 of a resident alien, the effect of our finding is to sustain petitioner's contention that the loss occurred in 1961.↩
5. One could argue that if a trade or business is established and the loss occurred after gaining resident alien status that is sufficient. See for example on this issue, Reiner v. Commissioner, 222 F.2d 770 (C.A. 7, 1955) and Weir v. Commissioner, 109 F.2d 996↩ (C.A. 3, 1940).